IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRAVIS DELANEY WILLIAMS,

                          Plaintiff,                                    OPINION AND ORDER

        v.
                                                                        20-cv-1021-wmc
SHERYL KINYON and
JAIME ADAMS,

                          Defendants.

---

*Pro se* plaintiff Travis Williams is incarcerated at the Wisconsin Secure Program Facility ("WSPF") and proceeding in this lawsuit under 42 U.S.C. § 1983 on claims against defendants Jaime Adams and Sheryl Kinyon, both health care professionals working at WSPF. Specifically, Williams claims both defendants acted with deliberate indifference to his requests for medical attention after he fell on June 24, 2019, in violation of the Eighth Amendment. Now before the court is defendants' motion for summary judgment. (Dkt. #119.) For the reasons that follow, the court will grant that motion and direct entry of judgment in defendants' favor.

UNDISPUTED FACTS[1]

Plaintiff Travis Williams has been incarcerated at WSPF since April 21, 2017. Both defendants are employees of the Wisconsin Department of Corrections ("DOC") and work

---

[1] Except where noted, the court draws the following, undisputed facts from defendants' proposed findings of fact and plaintiff's responses, as well as supporting evidence, as appropriate. Although Williams purports to dispute many proposed findings of fact, many of his disputes are conclusory and lack evidentiary support. Therefore, the court notes only those disputes that Williams has supported with admissible evidence.

in WSPF's Health Services Unit ("HSU").  When the events comprising Williams' claims took place in June of 2019, Jamie Adams was the Health Services Manager ("HSM"), and Sheryl Kinyon was a Health Service Assistant Manager ("HSAM").  They have both continued to work in these positions since that time as well.  In their respective roles, Adams' and Kinyon's responsibilities include:  developing procedures, monitoring care plans, preparing reports, acting as a liaison between disciplines and units as well as providers and the institution, and providing administrative support to HSU staff.  Like HSU nurses, neither the HSAM or HSM has the authority to prescribe medications, refer prisoners to offsite providers or override decisions of the HSUs Advanced Care Providers ("ACPs"), who are mainly doctors or nurse practitioners.  Instead, defendants regularly work with ACPs and are responsible for the overall administrative support and direction of the unit.

As of June 2019, the HSU was already seeing Williams for several conditions, including chronic pain, chronic testicular pain, hypertension, urinary incontinence, chronic GERD, hyperlipidemia, and folliculitis.  According to Williams, he fell in his cell on June 24, 2019, and injured his knee, left arm and elbow.  (Compl., dkt. #1, ¶ 2.)  Williams claims that he then asked a correctional officer in his unit to call a nurse for him.  About 20 minutes after he fell, Kinyon, who was attending to another prisoner located near Williams, looked through the window of his cell door.  Williams asserts that Kinyon looked directly at him through the window for several seconds, during which he told her that he fell, was injured and in pain, and believed he may have broken his arm because he could not move his elbow.  Williams further claims that Kinyon ignored him and walked away.

2

An hour after that interaction, Kinyon returned to Williams' unit, this time accompanied by defendant Adams, to attend to another prisoner.  Williams claims that he again complained to them both about his injury, to which Adams responded that he needed to fill out a "blue slip" -- formally a Health Service Request ("HSR").  Otherwise, Williams claims that both defendants ignored his complaints and walked away laughing.

Unsurprisingly, Kinyon and Adams recall these events differently.  Kinyon attests that she was not present at Williams' cell door at all that day, nor did she see or hear him say that he had fallen in his cell.  (Kinyon Decl., dkt. #125, ¶ 7.)  Adams similarly attests that she never saw Williams on June 24.  (Adams Decl., dkt. #124, ¶ 12.)  Further, defendants point out that no one else in Williams' unit documented his fall.

On June 25, 2019, however, the HSU received six HSR forms from Williams.  One of those HSRs reported his fall specifically, and another asked that his ice order be renewed.  In the lone HSR related to the fall, Williams wrote:

> 1.     I fell on 6/24/19 and this department was called and no one showed up[.]  I injured my knees & left wrist and elbow.
>
> 2.     I need something for this pain.

(Ex. 1008, dkt. #123-1, at 38.)  That same day, Kinyon ordered ice for Williams for 14 days. [2] (*Id.* at 13, 34.)  She also scheduled him to be seen by a nurse in the HSU, lacking the authority to order medications for Williams herself.

---

[2]  Williams disputes that Kinyon ordered the ice that same day, claiming instead that she did not do so until June 27, 2019.  As proof, however, Williams cites a June 24, 2016, HSR in which he requested that his ice restriction be renewed, and an inmate complaint affirming that he had not yet received ice (dkt. ##131-16, 131-42), neither of which indicates that Kinyon did not actually place an order for ice on June 25.

On June 26, HSU received another HSR from Williams directing the following statement to Kinyon: "[Y]ou big fat nasty ass Bitch you came to my door on 6-25-19 and heard me tell you I was injured and you big fat salami smelly nasty ass just ignored me bitch!" (Ex. 1008, dkt. #123-1, 30.)  Kinyon responded in writing, denying being at his door or communicating with him, but relaying that the HSU had received his HSR and that he would be seen that day.  Also on June 26, Williams directed a separate HSR to Adams, writing "[L]ook lady I fill out blue slips all the time out.  Bitch, I told you I was injured you walk off." (*Id.* at 28.)  Nurse Wehrle responded to that HSR, stating that Williams was scheduled to be seen by a nurse.  As a result, Adams did not see the HSR directed to her.

On June 27, the HSU received another HSR from Williams complaining that Adams and Kinyon ignored him when they were on his unit.  Adams did not see or respond to this HSR either; instead, Nurse Wehrle again handled it, scheduling Williams to be seen during a nursing sick call.  That same day, Nurse Wehrle examined Williams, noting a slight bruise to his left forearm.  Wehrle did not note any deformities but did note his complaint of worsening left shoulder pain since his fall.  Wehrle further noted that she examined his shoulder, recorded a baseline range of motion, advised Williams that he had upcoming appointments to address his pain, and encouraged Williams to continue icing the bruised area.

On July 1, 2019, Nurse Practitioner ("NP") Sandra McArdle also saw Williams before his surgery for an unrelated ailment.  Among other thing, McArdle noted that Williams again complained about his fall.  Although McArdle did not note any swelling or

4

redness, she did order two x-rays showing different views of his left elbow, both of which came back normal. NP McArdle saw Williams again on July 12. During that appointment, she noted that Williams had not mentioned any injuries related to his fall. (Ex. 1008, dkt. #123-1, 46-47.) Nevertheless, Williams claims he told McArdle that he was still in pain and did not have ice or a medication. Still, Williams does not dispute that he did not mention his fall specifically at his July 12 appointment.

On July 17, 2019, Kinyon examined Williams for his skin issues, describing their interaction as follows:

> He was derogatory and nasty, impeding our ability to treat him, and thus the visit ended. He did not mention any injuries related to his fall on June 24, 2019 during this appointment. Upon leaving the room Williams looked at her and said, "See you in court Bitch!" to which I did not respond.

(Kinyon Decl., dkt. #125, ¶ 16; *see also* Ex. 1008, dkt. #123-1, 4-7.) However, Williams disputes this account, claiming that (1) Kinyon refused to wear gloves and (2) in the past, she has made up false statements about his medical treatments. Even so, Williams neither disputes his name-calling nor that his behavior caused the visit to end.[3]

On July 31, 2019, Adams went with NP McArdle to Williams' cell to discuss a letter Williams had written about bottom and doughnut cushions. According to defendants, Williams did not mention any injuries related to his fall, while Williams claims that he brought it up "daily" until the end of August.

---

[3] Williams also submitted multiple exhibits as examples of Kinyon's lies, but this evidence does not create a genuine dispute of fact regarding Williams' admittedly inappropriate behavior during his July 17 interaction with Kinyon.

Before this July 31 visit to Williams' cell, a non-defendant, Unit Manager Brown, informed Adams and McArdle that Williams had been stockpiling medications in his cell, noting in particular that he had 15 different types of medication cards. (A medication card is a bubble pack containing a 30-day supply of a patient's medications.) According to HSM Adams, after consulting with WSPF's Security Director and HSM Kinyon, she decided that Williams was at a high risk of overdosing. Consistent with policy, security also searched Williams' cell, removed all oral medications, and turned them over to HSU for review.

Williams later received medical attention for his left shoulder, including rounds of cortisone shots, one of which took place on November 25, 2019. (*See* dkt. ##131-41.) He claims that these shots were necessary because of increased left shoulder pain suffered after the fall. However, the records of the November 25 injection indicate that he received cortisone shots for both shoulder joints (*id*), and his records further indicate that an order had been placed for the injections in March of 2019 (*see* dkt. ##137-4, 137-11), about three months *before* his claimed, June fall.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).

During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Both defendants seek summary judgment on the merits of plaintiff's claims of deliberate indifference under the Eighth Amendment.

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, however, an inmate must demonstrate two elements: (1) an objectively serious medical condition and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Defendants seek summary judgment on the second element alone, so the court will assume, without deciding, that plaintiff was suffering from an objectively serious medical condition because of his fall in June 2020.

"Deliberate indifference" is a high standard, requiring proof that the official was aware a prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, it is *more than* negligent acts, or even grossly negligent acts, although something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The threshold for deliberate indifference is generally met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious

7

harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

Here, plaintiff's claim boils down principally to an assertion that the defendants acted with deliberate indifference by failing to respond immediately to his claims of injury and pain from a fall. Certainly, an "[i]nexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007). "[E]ven brief, unexplained delays in treatment may constitute deliberate indifference," *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citation omitted), and "the length of delay that is tolerable depends on the seriousness of the conditions and the ease of providing treatment," *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Additionally, in circumstances where medical care is delayed, the Seventh Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)).

Acknowledging genuine disputes related to whether plaintiff informed Kinyon and Adams about his fall and note to be seen on June 24, 2019, defendants seek summary judgment because there is no evidence that would permit a reasonable trier of fact to

conclude that defendants' failure to examine him that day demonstrated a conscious disregard of his need for immediate treatment, nor that the delay until he filed a HSR under ordinary channels worsened his condition or unnecessarily prolonged his pain. In particular, his subsequent scans were normal and the advanced care provider who examined him on July 1 just told him to continue icing his bruise. In opposition, plaintiff maintains that the evidence of record shows that he was left to suffer in pain on June 24, when defendants walked away from his cell, and he disputes Wehrle's and McArdle's descriptions of how he described his pain when they met. However, on this record, even Williams' account only amounts to claims by a "frequent flyer" in the HSU that he had fallen, was in pain and needed to be seen, *not* that he was manifesting *any* symptoms requiring urgent care. Even if he had described more urgent issues, the defendants had a right to exercise some judgment as to his needs, which as the evidence shows, was ultimately sound.[4]

Said another way, the court accepts, as it must, that plaintiff told both Kinyon and Adams that he had fallen and been injured, that Adams told plaintiff to submit a blue slip to the HSU, and that Adams and Kinyon walked away laughing. Certainly, laughing at a prisoner who reported an injury lacks empathy, but to support an inference of deliberate indifference, there must be some evidence suggesting that their decision to laugh and walk away was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)). Accordingly, the

---

[4] Obviously on different facts, in which *both* symptoms and subsequent diagnosis demonstrate a need for urgent treatment, a defendant might face liability for deliberate indifference. However, those are not the facts before this court.

critical question is whether evidence suggests that: (1) Adams and Kinyon *knew* plaintiff needed more immediate care than submitting an HSR would provide; *and* (2) their failure to take more prompt action worsened his condition or caused him to suffer unnecessarily.

Even accepting plaintiff's version of events, he did not present to either defendant in a manner suggesting a need for emergency treatment that could not be obtained in the ordinary course by submitting an HSR. Specifically, plaintiff maintains that he told them about his fall and that he was in pain. Plaintiff also purports to have told Kinyon that he "believed" his arm was broken because he could not move it. Yet the facts are that he manifested no other signs of a broken arm, *and* his arm was not broken. Plaintiff does not even claim to have shown Kinyon that his arm was immobile, nor provided any other evidence that would have indicated to either Kinyon or Adams that he was suffering from any other injuries that would have alerted them to the need for more immediate medical attention. For example, there is no suggestion that plaintiff was bleeding, showed any swelling of his arm, had scratches or bruising indicative of a blow to his arm or shoulder that might have caused a break or severe pain, or had been unable to get up off the floor when defendants saw him. Therefore, the record does not support a reasonable finding that either defendant had reason to believe that plaintiff had suffered injuries requiring interruption of their care of other prisoners to immediately attend to his medical needs, as opposed to him submitting an HSR.

Moreover, Kinyon ordered ice for plaintiff the next day, in response to another HSR, and he was examined by a nurse just two days after that. Whether a delay in receiving medical care is tolerable depends on the seriousness of the condition and the ease

10

of providing treatment.  *McGowan*, 612 F.3d at 640.  Here, the evidence of record does not suggest that a three-day delay between plaintiff's injury and when Nurse Wehrle examined him either worsened his injury or unnecessarily prolonged his pain.  Plaintiff maintains that he suffered pain unnecessarily because he had *no* pain medication or ice during that period, citing documents indicating a delay in his refill of an existing prescription for the pain medication Celebrex.  (*See* dkt. #131-43.)  Yet the evidence of record would not permit a reasonable fact-finder to conclude that such a delay rose to a constitutional violation, much less resulted from deliberate indifference by these defendants.

To the contrary, plaintiff's June 24 through June 27 communications to the HSU do not support a finding that he alerted any HSU staff to untreated pain related to the fall. Indeed, within the many HSRs that plaintiff submitted between June 24 and June 27, plaintiff complained about pain just *once*, when he asked for something for his pain, and Kinyon responded to that complaint appropriately, writing that plaintiff would be seen soon and ordering him ice.  Plaintiff did not otherwise ask for medical attention for his pain associated with the fall; instead, in his other HSRs related to the fall, plaintiff opted for name-calling and cursing at defendants for walking away from him, rather than requesting to be seen or for pain relief.  Considering these communications, a reasonable jury would be hard pressed to avoid concluding that plaintiff was vexed by defendants' decision not to listen to him on June 24, rather than experiencing untreated pain.[5]

---

[5] Although the record is not well-developed on this point, it further appears that plaintiff possessed *many* pills in his cell, some of which were pain medications.  As of July 31, plaintiff possessed so many pill packs in his cell that staff were concerned he might overdose.  Plaintiff disputes this, but his evidence in support derails his claim that he lacked any pain medication.  Plaintiff cites a list of medication that he was prescribed on a daily basis during that time, and that list included the pain

Regardless, there is no evidence as to what defendants Kinyon and Adams could have done on June 24 that would have altered plaintiff's treatment in a meaningful way beyond what Kinyon did the next day.  Although plaintiff insists that he never received the ice as ordered and correctly states he was not seen on the 24th or 25th, no evidence of record permits a reasonable jury to infer that Kinyon knew that her June 25 order for ice did not go through *or* that plaintiff was not seen promptly.  Furthermore, it is undisputed that Nurse Wehrle *did* examine plaintiff on June 27, addressing his complaint that his left shoulder pain had worsened since the fall, checking his range of motion, and advising him to continue icing.  Importantly, Wehrle neither ordered any other interventions to address pain associated with the fall nor referred him to an advanced care provider.  While plaintiff insists that Wehrle downplayed his pain, there is no evidence suggesting that Wehrle should have done more at that time or would have done anything more if she had seen him sooner.  Indeed, when NP McArdle examined plaintiff again less than a week later, she also identified no swelling or mobility issues, and the two, left elbow x-rays she ordered came back normal.  Finally, plaintiff did not subsequently report pain or issues related to his fall in later interactions with HSU staff.  Thus, although plaintiff insists that Wehrle and McArdle failed not properly accounting for his pain complaints, he has come forward with *no* evidence of an injury or pain that went untreated, much less worsened because he had not been seen for three days.

Instead, plaintiff cites the cortisone shots he received in November of 2019.  (*See*

---

medication acetaminophen.  (*See* dkt. #131-26, at 1-4.)  That medication may have been prescribed to treat other issues, but if this evidence were before a jury, it would be difficult to conclude reasonably that plaintiff had "nothing" for his pain.

dkt. ##131-41, 137-4.)  Yet the records related to those injections indicate that the order for a left shoulder injection had been placed in March of 2019, *before* he supposedly sustained a left shoulder injury from the fall.  Plaintiff acknowledges this, but insists that his left shoulder was injured, and that even though both shoulders were being treated prior to the fall, an orthopedic surgeon wanted to operate on his left shoulder in addition to his right.  However, plaintiff only brings up the surgeon's statement in his opposition brief (*see* Pl. Opp'n Br., dkt. #128, at 9-10), and even then, without citing any evidence of record indicating that a surgeon recommended additional treatment or surgery for his left shoulder *due to his fall*.  And even if a surgeon wanted to operate on his shoulder, there is no evidence suggesting that the surgeon believed plaintiff's shoulder condition worsened as a result of the fall, or, more importantly, that *defendants'* failure to attend to his injury immediately somehow worsened his condition or associated pain.  The fact that plaintiff later underwent cortisone shots that were scheduled before his fall does not support such findings.

Finally, plaintiff raises several additional arguments that require little comment.  First, he points to a long history of falls during his incarceration, for which he had received immediate care.  Yet examples of other instances in which plaintiff has fallen are not relevant to whether defendants responded with deliberate indifference to his June 24, 2019, report of a fall.  Plaintiff raises other general concerns with how WSPF officials have responded to his various other medical needs, but those grievances are not part of his claims in this lawsuit.  Plaintiff also claims that defendants have falsified his medical records and have refused to respond to discovery requests, but his falsification claim is wholly unsubstantiated and conclusory, and he has not filed a motion to compel, so the court

summarily rejects these arguments as well.  Similarly, plaintiff would challenge the court's sanction precluding him from serving defendants with more discovery, which he claims prejudiced his ability to litigate this case.  In particular, he claims being unable to gather medical records that would show a surgeon recommended surgery for his left shoulder. However, the court's sanction did *not* prohibit plaintiff from reviewing or gathering his own medical records.  Moreover, plaintiff's abusive discovery requests were inexcusable, and as Judge Crocker explained, the court would have been well-within its discretion to dismiss his case outright, rather than merely restrain his "fishing expedition" in discovery.  (6/15/21 Order, dkt. #112, at 6-7.)  Accordingly. the court sees no basis to reconsider its sanction or to elaborate further on Judge Crocker's measured ruling.  In any event, plaintiff's claimed inability to obtain further discovery did not prevent him from submitting evidence related to the nature of his pain between June 24 and June 27, 2019, nor as to the actual medical reason for his shoulder surgery.  Thus, to the extent plaintiff is also asking the court to reopen discovery, those requests are denied.

In summary, no reasonable fact-finder could conclude on this record that defendants Kinyon or Adams consciously disregarded plaintiff's need for medical attention on June 24, 2019, nor that their failure to take immediate action on that date worsened his condition or caused him to endure pain needlessly.  Therefore, defendants' motion for summary judgment will be granted and this case will be closed.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #119) is GRANTED.

2) Plaintiff's motion asking the court to deny defendants' motion for summary judgment (dkt. #132) is DENIED as moot.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 21st day of October, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

15